IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEREK BLOCKHUS,           )
          )
          Plaintiff,      )     Case No.  22 C 3867
          )
   v.           )
          )     Judge Robert W. Gettleman
UNITED AIRLINES, INC.,     )
          )
          Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Derek Blockhus has sued his former employer, United Airlines, Inc., claiming that his employment was terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq (Count I), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611(2)(A) (Count II), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 et. seq. (Count III). Defendant has moved under Fed. R. Civ. P. 56 for summary judgment on all counts. For the reasons described below, defendant's motion is granted, and judgment is entered in its favor.

## BACKGROUND

Plaintiff worked as a flight attendant for defendant from approximately March 15, 1997, until his termination on February 26, 2021. His employment was governed by a collective bargaining agreement ("CBA") between defendant and the Association of Flight Attendants – CWA. In November 2019 plaintiff entered into an intimate/sexual relationship with another flight attendant, Katherine Lense. At that time Lense was unaware that plaintiff was married.

In early January 2021 plaintiff reached out to Human Resources Manager Vanessa Beiro to complain about a flight attendant who was allegedly creating a hostile work environment for

him.   He withdrew that complaint when he learned that other flight attendants did not want to be involved as witnesses.   On January 25, 2021, he again reached out to Beiro stating, "Hi again Vanessa, unfortunately I have a new case, her name is Katherine Lense and this time I will provide names and file numbers.   I will have the report to you by tomorrow."

Plaintiff and Beiro arranged for a call for February 1, 2021.   Plaintiff did not make that call, and the following day he wrote to Beiro stating that he was "coordinating with another flight attendant who plans to register a complaint against the same person and we should be submitting them very soon."   During this time, plaintiff had heard that Lense was claiming that she saw plaintiff and another married flight attendant, Mindy Richards "smooching at the airport," and

that plaintiff and Richards were having an affair.   Plaintiff also claims to have heard that there was a rumor that he had tried to break into Lense's apartment, and that Lense had to physically fend him off.   Lense denies saying any of that.

Lense claims that her relationship with plaintiff ended in late summer/fall and they remained friends until early January.   Plaintiff claims that the relationship ended sometime in December 2020, and that he ended it.

On January 24, 2021, plaintiff left Lense (who was returning to work after a furlough) a voicemail message:

> Hey Katherine, this is Derek.   Hope you're doin' OK.   Just heard some stuff.   You're saying that I'm stalking and stuff like that and also about Mindy, which is scary, but anyways I don't care about any of that stuff.   But I just want you to know that's what I heard, I heard you were saying that stuff and I don't care.   But I hope you're doing good and hope we can just talk.   That'd be nice. I'm on a trip right now but I just don't like to, you know, have this weird relationship.   It's just not – I mean – not that we have to be

2

> friends or nothing but definitely don't want to hear stuff on the line about things like that.   Like I'm stalking you and I was trying to break into your apartment.   Believe it or not I heard that.   That's what people are saying that you're saying.   It's unbelievable. Anyway, that's fine.   Hope you're doin' good, and welcome back to United.   Maybe I'll hear from you, I don't know.   Bye.

When he did not hear from Lense, plaintiff left her another message:

> Hey, Katherine. This is Derek. I was really hoping you were going to answer the phone. So, here's the deal. You've pretty much created a hostile working environment for me and, you know, people are calling me crazy and whatnot. It's all because what you are saying about me and I was hoping you and I could talk about it and you did create a hostile work environment for me. I gotta stop it, man, just, I can't take it no more. It's more than a couple people that are talking about it and they're all saying it's you. So, I was hoping we could talk about it. I would rather talk to you about it, not HR, cause HR would open a disciplinary investigation against you and bring in all your friends and no one's gonna be happy hearing that. And, on top of that, you're trying to ruin Mindy's marriage at work and she might file charges against you, as well, so, just call me. Let's get this over with because it's gonna get ugly. And, everybody's says it's you and they're gonna bring in people like Karen Martinez, especially her. A lot of people are talking and, like I said, I can't come to work this way. It's affecting my job. HR, if they get involved, it's not gonna get good and you are just coming back to work and I don't think you want to come back to work under investigation, so, please call me. I don't want Mindy to press charges either. So, let's get this cleared up. Thanks. Bye.

After receiving that message, Lense felt shaken and considered it threatening in relation to her job.   She contacted her Base Manager who directed her to Ethics and Compliance.   She spoke with Corporate Security Senior Manager, Harassment and Discrimination Investigations, Kimberly Phillips.   She sent Phillips screenshots of text messages she stated were sent by plaintiff, as well as the January 25th voicemail.   Included in the screenshots of text messages were:

3

Not a good way to be known for any longer with united
I'll f*** you for a trip
[***]
You w[an]t[] to make sure everyone at United know you'll f***
for a trip
[***]

Sun, Oct 11[,] [2020]
Call me right now or I'm going to do something that will horrify
you
5
4
3
2
[***]
I'm going to give you one more chance to answer my call.
One more
Then your dad will hear from me with pics
[***]

[January 25, 2021]
Katherine, going to call you in about 30 min and it's very
important you answer.
This call is in regards to your job with United
[***]
Be ready to be horrified
Better call me right now
[***]
Here's what[']s going out [t]o your family
[***]
I[']m going to call you one more time, you don't answer, [I']m
texting a video to your dad[']s
friend
[***]
Call me right now
Done with being nice
You do realize, your dad and all his friends are going to get nudes
of you? Because you
treated my like sh**. You better call me because I'm sick of this
bullsh**.
10
[***]
I'll be there tomorrow with a big box and I want it all back. Done
with the disrespect.

4

> Give it all back, or well you know
> [***]
> Call me now or I will be there when I land tomorrow and I want
> everything
> Ok put everything in a box [I']ll be there tomorrow
> Airpods and all
> No one uses me
> No one uses me
>
> Mon, Oct 12, 5:53 AM
> Sorry about the threats but unfortunately that[']s [the] only way
> you will answer my call or text these days.

Plaintiff now denies that he sent the text messages or that any part of the messages affirmatively identifies him or his cell phone number. On the morning of February 4, 2021, plaintiff spoke with Performance Support Supervisor Kayla Howell because he had learned that he was under investigation. That same day he received an email sent by Performance Supervisor Frank Hester including a Letter of Investigation ("LOI") for Performance prepared by Howell, informing plaintiff that in accordance with the Flight Attendant Agreement, a meeting would be conducted on Monday, February 8 at 11:00 a.m. via Microsoft Teams to investigate the text messages. The letter included examples of the texts listed above.

After receiving the LOI plaintiff went home because he was placed "out of service." He left a voicemail for Howell stating:

> Hey Kayla. This is Derek. I just got the email saying the reason why I'm being investigated. It's ridiculous. That's an ex-girlfriend I used to date, who we had a weird relationship, and she was like – I mean, it's completely – I can explain this whole thing, my text message. There's a reason --- anyways. I am so glad – I am so relieved that this what it is. I can't imagine what else it could have been. So anyway – so, basically, I threat – she was ending – sending out rumors about me to United, and I threatened to go to HR, and that's why she did this. And I – I mean, I threatened, but I would never do that because I do still care about her. And because

> I threatened, I don't know if that's why she did it. I have witnesses, and I have voice recordings of myself and messages with her saying that, please, don't talk –make – spread rumors about me and – me and another flight attendant and things of that nature. And I did mention to her I was going to go to HR, because she was putting things into United. Those messages between me and her were private, you know, in our private line. So I don't know how that works with United. And there's a – there's a huge back story to that. So this is easily fixed. Thank you very much.

On February 5, 2021, the day after receiving the LOI, plaintiff filed a complaint against Lense. He and Richards collaborated on and emailed similar statements to Beiro indicating that after he tried to reach out to Lense about the rumors, "she immediately dug up an old text from an argument they had a few months ago and tried to now claim harassment against me to HR." Two days later he wrote to Biero withdrawing his case against Lense effective immediately" stating:

> We believe [Lense] … dug up information from a horrible alcohol and passion fueled argument we had about three months ago that I had no idea existed. I do feel I need to explain that text, I have no recollection of writing or sending it, in fact I could not even read it as it made my stomach nauseous. However, I do see how it could have been constru[]ed. . . . Again, this night was completely regrettable, reckless and out of control. This was an absolutely regretful and painful night of which I have since sought help with my primary caregiver . . . .

On February 8, 2021, plaintiff sent a written statement to members of the Union, as well as Biero, Base Manager Bell and others at United stating:

> I am painfully aware that the preconception of me coming into this hearing today is not good, and in fact dreadful. Any exchange of words that night three months ago between Ms. Lense and myself were strictly out of anger and frustration during a heated alcohol fueled argument and absolutely, not an attempt to sexually harass my dear friend M[s]. Lense. Ms. Lense and I did have a fight that night, I did say ugly regretful things, and I acted like a stupid teenager . . . In no way do I condone any form of sexual

6

harassment. I now do realize the dangers of word choice. I admit I regretfully used a poorest choice of word while arguing with Ms. Lense that
night however I categorically would never sexually harass anyone.

I do feel I should address the text message submitted with the complaint as it is so very disturbing. I could not even finish reading it as it made my stomach nauseous. This was three months ago and though I have no recollection of sending it, I do see how it could have been constru[]ed. I do realize the seriousness of the charges
brought on to me by Ms. Lense and I pray the committee will consider all mitigating circumstances. Both the timing of the clime [sic] and the fact that we remained good friends long after that night. I am only human and sometimes even at age 52, being under the influence of too much alcohol or elevated emotions we can say the
most adolescent, senseless and regretful things we do not mean during a passionate argument.

Ms. Lense is an amazing flight attendant with an incredible work ethic and has a bright f[u]ture. I am pleading to Ms. Lense for the forgiveness of my poor choice of words; the remorse I feel is incomprehensible.

A few hours later, plaintiff sent another email to the same people, stating "Im sorry Please disregard, I will send you a final draft shortly.   Sorry I have not slept in 4 days and it is difficult to concentrate."  He never sent a "final statement."

To prepare for the scheduled February 8 LOI meeting, Howell sent plaintiff and the Union   a packet of exhibits that included the LOI, the January 25 voicemail provided by Lense, plaintiff's statement and request to withdraw his complaint against Lense, and information about Senior Investigator, Harassment & Discrimination Investigations John McCormick having been assigned the investigation into Lense's complaint.   Plaintiff claims he never saw this email.

Plaintiff met with the Union before the scheduled LOI meeting.   He was very anxious and having bad anxiety attacks, so the Union connected him with the Employee Assistance

7

Program ("EAP").   He told the EAP he suffered from alcoholism, so it connected him with a

rehab facility in Florida.   He checked into that facility on February 10, 2021.   Before checking

in he suggested to Richards that she withdraw her complaint against Lense, which she did.

After receiving Richard's message as well as a voicemail message from plaintiff, the Employee

Relations Department informed Biero that it was closing the investigation into plaintiff's

complaint.

On February 11, 2021, Lense sent McCormick additional information about further

contact plaintiff had initiated while under investigation, including a handwritten note plaintiff

left on Lense's car on February 4th stating "Katherine Please I am about to be fired because of

your report.   Please I beg you to retract it.   I will lose my job! Please! Help me! Sorry to contact

you this way."

Lense also provided McCormick with text messages plaintiff sent to her similar to the

handwritten note asking her to retract her report, a voicemail left on February 5th from an

attorney hired by plaintiff stating he wanted to see if they could resolve their differences, and an

email sent to her on February 8th at her United email address from plaintiff's wife with the

subject line "Derek's wife" and providing her telephone number if she wanted to "chat for a bit."

The following day, February 11, Hester sent emails to plaintiff and the Union

enclosing:1) a letter from Howell directing plaintiff to refrain from contacting Lense and to

provide United Medical with documentation substantiating his medical inability to attend the

February 8 meeting and to attend a rescheduled meeting set for February 15th via Teams; and 2) a

revised LOI letter rescheduling the meeting to February 15 to discuss the February 4 LOI as well

as plaintiff's attempts to contact Lense after receiving the LOI.   Neither Howell nor Hester

knew that plaintiff would be medically unavailable to attend a Teams meeting. Plaintiff was not checking his United email while in rehab and did not receive the emails or attend the meeting. On February 16, United Medical approved plaintiff's FMLA leave.

Defendant proceeded with the investigation claiming that the serious nature of the allegations and CBA deadlines required it to do so. On February 22, 2021, McCormick prepared a Statement Of Findings, concluding that plaintiff had sent threatening and harassing communications via text and voicemail to Lense, admitted threatening Lense in a voicemail to Howell and sending the texts in his statement, as well as contacting Lense after being informed of the LOI. On February 26, 2021, Hester informed the Union that defendant was proceeding with plaintiff's termination. On March 3rd Hester sent plaintiff a letter explaining how his conduct violated the "Working Together Guidelines" and defendant's Harassment and Discrimination Policy, and terminating plaintiff's employment effective February 26th.

The Union grieved plaintiff's termination, arguing that plaintiff had not been able to attend an investigatory meeting. The grievance was pursued into arbitration, at which time plaintiff abandoned it. After plaintiff completed rehab, Phillips interviewed him in relation to his complaint against Lense and concluded that Lense had credibly brought her concerns to the company based on the messages she had received and not in retaliation for plaintiff having filed a complaint against her.

## DISCUSSION

Defendant has moved for summary judgment on all counts. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears

the burden, and the court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  But the nonmovant must do more than raise "some metaphysical doubt as to the material facts."  Id. at 586.  Rather, the nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

Defendant first argues that all of plaintiff's claims are preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq.  The RLA, which governs railroads and airlines, was passed to provide for "the prompt and orderly settlement" of labor disputes in those industries. Carlson v. CSX Transp., Inc., 758 F.3d 819, 831 (7th Cir. 2014).  The RLA requires that so called "minor disputes" be resolved in arbitration before an adjustment board established by the employer and union.  Id.  Minor disputes are those that grow "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions."  Id.  Put more simply, minor disputes are those that are grounded in a collective bargaining agreement.  Id.  The Supreme Court has held that a claim based on a right that is independent of a collective bargaining agreement is not subject to mandatory arbitration.  A claim is independent if it cannot be conclusively resolved by interpreting the collective bargaining agreement.  Id. (citing Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 263 (1994)). Further, even if a claim does not arise under a collective bargaining agreement, the RLA may still preclude it if "its resolution depends on the disputed meaning of or requires interpretation of contract terms."  Rabe v. United Air Lines, Inc., 636 F.3d 866, 872 (7th Cir. 2011).

10

In the instant case, defendant argues that plaintiff's claims are preclude because each is dependent on an allegation that defendant failed to properly investigate the claims and failed to allow him to appear at an investigatory meeting, which is governed by the CBA.   It is true that much of plaintiff's complaint is based on allegations of a faulty investigation.   The introduction to his brief provides that "United failed to conduct a thorough investigation . . .", and "United, based on an incomplete and biased investigation that did not even include an interview of [plaintiff] . . .." Nonetheless, the court disagrees with defendant's assertion that the claims are precluded by the RLA.   Resolution of the claims does not require an interpretation of the CBA, and a conclusion that defendant complied with the provisions of the CBA governing investigations would not resolve the claims.   Even if defendant complied with all the provisions governing the investigation, it could still have terminated plaintiff based on his age, disability, or having taken FMLA leave.   The issue is whether defendant took the actions it did because plaintiff was an older worker, had a disability, or in retaliation for having taken FMLA leave, not whether the investigation was complete.   Those claims require inquiry into defendant's motive, not any provision of the CBA.   See e.g. Coleman v. Soo Line Railroad, 2022 WL 4465902 at * 4-5 (ND. Ill. Sept. 26, 2022) ("In short, Plaintiff's claims as pled derive from Title VII rather than from any rights he had under the CBA and they turn on a factual inquiry into Defendant's motives for its adverse actions.").

Next, defendant argues that plaintiff has failed to present any evidence of discrimination under either the ADA, or ADEA.   The court agrees.   At the summary judgment stage, the court asks whether a reasonable jury could conclude that plaintiff's age or disability was the cause of his termination.   Ortiz v. Werner Enters., Inc., 834 F.3d 760, 764 (7th Cir. 2016).   He can rely

11

on two separate frameworks to show discrimination. Under what has become known as the holistic approach, plaintiff "can point to sufficient evidence in the record, whether called direct, indirect, or circumstantial, from which a reasonable jury could conclude that defendant fired him because of his age or disability." Rogers v. Chi. Bd. of Educ., 261 F. Supp. 3d 880, 888-89 (N.D. Ill 2017) (citing Ortiz, 834 F.3d at 764). Under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), plaintiff must first establish a prima facie case for discrimination, which requires evidence that plaintiff was meeting defendant's legitimate expectations. The burden then shifts to defendant to present a "legitimate non-discriminatory reason" for its decision. If defendant presents a legitimate reason, the burden shifts back to plaintiff to show the proffered reason is a pretext for discrimination. Bless v. Cook County Sheriff's Office, 9 F.4th 565, 574 (7th Cir. 2021). "The defense bears the burden of articulating the justification, but the plaintiff bears the burden of showing that the justification is a pretext." Sterlinski v. Catholic Bishop of Chi., 934 F.3d 568 571 (7th Cir. 2019).

If the employer raises the employee's performance as the reason for the employment decision, the court can skip the prima facie analysis, and proceed directly to pretext, because the issue of satisfactory performance and pretext overlap. Bragg v. Munster Med. Rsch. Found. Inc., 58 F.4th 268, 271 (7th Cir. 2023). "Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1045 (7th Cir. 2000).

Plaintiff first relies on the McDonnel Douglas framework to establish a prima facie case of discrimination. Defendant does not dispute that plaintiff is over 40 years old and suffers from the disabilities of severe alcohol dependency and generalized anxiety disorder. He obviously

12

suffered an adverse employment action when he was terminated from his position.    Defendant does dispute, however, that plaintiff was meeting defendant's legitimate performance expectations, or that he was treated differently than other employees outside of the protected classes.

Plaintiff argues that the fact that from the time of his hire in 1997 until February 2021 he had received only two performance warnings shows that he was meeting defendant's legitimate expectations.    As defendant points out, however, the question is not whether he ever satisfied defendant's expectations, but whether he was meeting defendant's expectations at the time of the adverse action.    Zayas v. Rockford Mem'l Hosp., 740 F.3d 1154, 1158 (7th Cir. 2014).    And defendant has never argued that plaintiff's actual performance as a flight attendant suffered. Instead, defendant terminated plaintiff because of his failure to comply with the requirements of defendant's Working Together Guidelines and Harassment and Discrimination Policy.

Plaintiff argues that the court should ignore McCormick's finding that plaintiff threatened and harassed Lense because McCormick relied exclusively on Lense's evidence, failed to take any steps to authenticate or verify the documentary evidence (texts) that Lense submitted, and was unable to assess Lense's credibility because he spoke to her only over the telephone.    But, although he now denies sending the threatening texts to Lense, plaintiff admitted sending them in his voicemail to Howell and his February 28, 2021, written submission.    Thus, there was really no reason for McCormick to go to lengths to verify what plaintiff had already admitted.

Moreover, even if plaintiff could somehow establish that he was meeting defendant's expectations, there is no evidence that defendant's reason for terminating plaintiff was a pretext for either age or disability discrimination.    There is simply no doubt that based on the

13

information it had, defendant had a legitimate reason for its actions, and plaintiff has presented

nothing to suggest that the reason is "a lie, specifically a phony reason for some employment

action." Hasham, 200 F.3d at 1045.

Plaintiff argues that McCormick's failure to thoroughly investigate is evidence of pretext

for discrimination. But there is simply no evidence to suggest that defendant did not have an

honest belief that plaintiff had threatened and harassed Lense, something he admitted doing.

Consequently, the court concludes that plaintiff has failed to carry his burden under the

McDonnell Douglas framework.

Moreover, although plaintiff has not attempted to rely on the holistic approach, there is

simply no evidence in the record, direct, indirect, or circumstantial, from which a reasonable jury

could conclude that plaintiff was terminated because of his age or disability. He has failed to

identify any ageist remarks by anyone, let alone Hester, who was the final decision-maker. The

same is true regarding his disabilities. Indeed, there is no evidence that Hester had any

knowledge of or the severity of plaintiff's disabilities. He knew only that plaintiff was

"medically unavailable" for the scheduled meetings. Additionally, both McCormick's

investigation and Hester's decision to terminate were reviewed by a Corrective Investigation

Committee comprised of individuals from Inflight Management, Human Resources, Labor

Relations, Legal, and Internal Audit, whose function is to ensure the defendant is consistent in

issuing discipline. There is no evidence that the committee based its decision on plaintiff's age

or disabilities. Consequently, the court grants defendant's motion for summary judgment on

Counts I and III.

14

In Count II plaintiff alleges that defendant denied him FMLA benefits by terminating him while he was on FMLA leave. He also alleges that he was terminated because he exercised his rights under the FMLA. As defendant points out, however, although termination can constitute a denial of FMLA benefits, see Nicholson v. Pulte Homes Corp., 690 F.3d 819, 827 (7th Cir. 2012), an employer may rebut such a claim with evidence that the employee would have been terminated regardless of whether he took leave. Pagel v. TIN Inc., 695 F.3d 622, 629 (7th Cir. 2012). "Thus, employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." Ogborn v. United Food and Comm. Workers Union, Local No. 881, 305 F.3d 763, 768 (7th Cir. 2002). That is precisely what the undisputed evidence shows in the instant case.

Finally, there is no evidence that defendant terminated plaintiff in retaliation for taking leave. An FMLA retaliation claim requires plaintiff to present evidence that: 1) engaged in protected activity; 2) suffered an adverse action; and 3) a causal connection exists between the two. Lutes v. United Trailers, Inc., 950 F.3d 359, 368 (7th Cir. 2020). Evidence of a causal connection may include suspicious timing, ambiguous statements or behavior towards other employees in the protected group, evidence, statistical or otherwise that similarly situated employees outside the protected group systematically received better treatment, and evidence that the employer offered a pretextual reason for the action taken. Rowlands v. United Parcel Ser. Fort Wayne v. United Parcel Ser. Fort Wayne, 901 F.3d 792, 801-02 (7th Cir. 2018).

Plaintiff argues that his termination during his FMLA period is evidence of a causal connection. But, as noted above, the FMLA does not prohibit termination during an employee's leave if it is otherwise appropriate. Anderson v. Nations Lending Corp., 27 F.4th 1300, 1306 (7th

15

Cir. 2022). That is precisely what the evidence shows in the instant case, particularly since plaintiff was issued the LOI before he started leave. In short, the record is devoid of any evidence that plaintiff was terminated for having applied for and taken FMLA leave. Consequently, the court grants defendant's motion for summary judgment on Count II.

## **CONCLUSION**

For the reasons described above, defendant's motion for summary judgment [40] is granted.

ENTER:

Robert W. Gettleman
United States District Judge

DATE:    December 19, 2023

16